No. 2--03--0879          Filed:  3/31/06

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS. | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 02--CF--1406 |
| | ) ) | |
| STEVEN T. ROGERS, | ) ) | Honorable Michael J. Burke, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE O'MALLEY delivered the opinion of the court:

On May 2, 2003, defendant Steven T. Rogers entered a blind plea of guilty but mentally ill to one count each of armed violence (720 ILCS 5/33A--2(a) (West 2002)), home invasion (720 ILCS 5/12--11(a)(2) (West 2002)), and aggravated battery (720 ILCS 5/12--4(b)(1) (West 2002)).  The circuit court of Du Page County sentenced defendant to concurrent terms of imprisonment of 23 years for the armed-violence and home-invasion convictions and 5 years for the aggravated-battery conviction.  Defendant's motion to reconsider sentences was denied and defendant appeals, arguing, first, that the aggravated battery conviction cannot stand because it violates the one-act, one-crime rule and is a

lesser-included offense of armed violence and, second, that his sentences were excessive. We affirm.

The following facts are taken from the record on appeal. On March 5, 2002, Dawn Grommon was inside her condominium apartment, in her bedroom. At about 3:15 a.m., she awoke because she felt a draft of cold air. She investigated, discovering that her patio door was open. She closed and barred the patio door, remaining awake and watching TV in her living room. Eventually, she decided to go to her bathroom and get ready for work. When she got to her bathroom, she was unable to move the bathroom door because something appeared to be blocking it. She looked around the door and discovered defendant, who had a knife in his hand. As she saw defendant, he said, "You bitch," and began stabbing Grommon. Defendant then stabbed Grommon between 8 and 10 times. Grommon said, "I'm going to die. I'm going to die, I don't want to die." Defendant stopped stabbing her, got Grommon's cordless phone, dialed 911, and handed Grommon the phone. Defendant then left the apartment. Grommon informed police of defendant's identity, having recognized him because he lived in the same building as she.

Defendant was arrested later that morning. On March 6, 2002, the State filed a delinquency petition charging defendant, who was 16 years old on that date, with having committed the offenses of home invasion and aggravated battery. Also on March 6, 2002, the State filed a motion to prosecute defendant in adult court pursuant to the mandatory transfer provision of the Juvenile Court Act of 1987 (705 ILCS 405/5--805(1)(c) (West 2002)). The public defender was appointed to represent defendant. Also during the March 6, 2002, hearing, defense counsel asked to have defendant evaluated for fitness. The basis of counsel's request was defendant's earlier diagnosis of bipolar disorder, the fact

that defendant had missed taking one of more doses of his medication, and the youth home's report that defendant had behaved unusually the night before.

Defendant was examined by Dr. Corcoran (whose name is represented in various ways in the reports of proceedings in the record on appeal), who, on March 7, 2002, wrote a letter setting forth his opinion that no bona fide doubt existed regarding defendant's fitness to stand trial. On March 8, 2002, the juvenile court made a finding of no bona fide doubt as to defendant's fitness to stand trial. Defendant then stipulated as to the necessity for his detention and requested a hearing on the existence of probable cause for the detention. The juvenile court heard the testimony of Aurora police officer Harold Carter and held that probable cause existed for the detention of defendant.

On April 26, 2002, the juvenile court held a hearing on the State's motion to transfer the case to adult court. Following testimony on the disputed issue of probable cause to believe that defendant committed the crimes of home invasion and aggravated battery, the juvenile court ordered the case to be transferred to adult court.

On May 14, 2002, the State indicted defendant with two counts each of armed violence, home invasion and aggravated battery. As relevant here, we quote the indictment:

> "[Count I] [Defendant] committed the offense of ARMED VIOLENCE in that the said defendant while armed with a dangerous weapon, a knife with a blade at least 3 inches long performed acts prohibited by 720 ILCS 5/12--4(a) [(West 2002)], in that he in committing a battery in violation of 720 ILCS 5/12--3 [(West 2002)], knowingly caused great bodily harm to Dawn Grommon in that he stabbed her repeatedly, in violation of 720 ILCS 5/33A--2(a) [(West 2002)].

* * *

[Count VI] [Defendant] committed the offense of AGGRAVATED BATTERY in that the said defendant in committing a battery in violation of 720 ILCS 5/12--3 [(West 2002)] and by use of a deadly weapon, a knife, knowingly caused *** bodily harm to Dawn Grommon, in that he stabbed Dawn Grommon repeatedly, in violation of 720 ILCS 5/12--4(b)(1) [(West 2002)]."

Count VI was orally amended in court, without objection, so as to remove the word "great," which preceded "bodily harm" in the original, written indictment.

The public defender continued to represent defendant in adult court. On August 26, 2002, the trial court issued an order allowing Dr. Michael Rabin to meet with defendant in order to perform an evaluation of defendant for the purpose of assisting his defense.

On September 12, 2002, Dr. Rabin issued a report of his examination of defendant. Dr. Rabin described defendant's background and previous diagnoses, and he summarized the results of the testing he performed with defendant. Dr. Rabin diagnosed defendant as experiencing "bipolar disorder, most recent episode manic, in partial remission with medication," and "post-traumatic stress disorder, by history." Dr. Rabin opined that defendant was experiencing a mental disease that compromised his ability to conform his conduct to the requirements of the law, but was legally sane at the time of the offenses. Dr. Rabin also opined that defendant was fit to stand trial. Dr. Rabin noted, however, that he was unable to determine whether, on March 6, 2002, defendant was able to fully comprehend and waive his Miranda rights when he made an inculpatory statement to police following his arrest.

On May 2, 2003, defendant decided to enter a plea of guilty but mentally ill to counts I (armed violence), III (home invasion), and VI (aggravated battery). The State stipulated that defendant experienced the mental illness, bipolar disorder. Defense counsel announced that he had no bona fide doubt regarding defendant's fitness to plead guilty. The trial court admonished defendant regarding his rights and the effects of entering a guilty plea; defendant said that he understood and that no one had threatened him or promised him anything in exchange for his plea.

The factual basis included a summary of Dawn Grommon's prospective testimony, which is set forth above. Officer Harold Carter would have testified that defendant was arrested at his apartment, which was in the same building as Grommon's apartment. Officer Carter also participated in the interview of defendant at the police station. Defendant admitted entering Grommon's apartment and stabbing her when she discovered him hiding in her bathroom.

Officer Scott Carter, an evidence technician with the Aurora police department, would have testified that he collected a steak knife with a blade of over three inches in length from the kitchen sink of defendant's apartment. Carter noticed a red substance on the knife, which tested positive for human blood. The blood was later identified as Grommon's.

The parties would have stipulated to Dr. Rabin's testimony that he performed a psychological evaluation of defendant. Dr. Rabin diagnosed defendant with bipolar disorder.

Defendant stipulated to the State's summary of the evidence. The trial court found that a factual basis existed for the plea and that defendant entered his plea knowingly and

voluntarily. The trial court further determined that defendant was presently fit to enter his plea. The trial court proceeded to find defendant guilty but mentally ill.

Immediately following the guilty plea, the sentencing hearing began. Officer Harold Carter testified that he was an investigator in the juvenile division of the Aurora police department. At 8:22 a.m. on March 5, 2002, Officer Carter and Officer Randy Place interviewed defendant about the attack on Grommon. Defendant told them that he awoke at about 2 a.m. that morning and could not get back to sleep. Defendant put on a black sweatshirt, black sweat pants, and a size 12 and a size 10½ shoe, grabbed a "switchblade type knife," and went to Grommon's apartment, which was in his building. Defendant tried Grommon's patio door, which slid open. Defendant went inside and deliberately left open the door so that the cool draft of air would distract Grommon. He saw Grommon, whom he knew to be a building resident, sitting in her bedroom watching television.[1] He snuck into Grommon's laundry room and stood there for a few minutes, then moved into Grommon's bathroom and stood behind the door.

Defendant saw Grommon go into her living room, discover the open patio door, and close it. Grommon then sat down and watched television for a while. Later, Grommon got up and tried to enter the bathroom where defendant was hiding behind the door. When

---

[1] We note that the factual basis for defendant's guilty plea asserts that Grommon was asleep, yet defendant's statement to Officer Carter asserts that she was awake. This disparity is not relevant to the issues on appeal and, in any event, is likely explained by the differing perceptions between Grommon and defendant.

Grommon could not fully open the bathroom door, she looked behind it. When defendant realized that she was looking at him, he started to stab Grommon with his knife.

Officer Carter asked defendant why he stabbed Grommon. Defendant stated that "he really didn't know." Defendant told Officer Carter that he knew Grommon from living in the building, had no problems with her, and thought that she was "really cool."

Defendant told Officer Carter that, when he was done stabbing Grommon, he started to leave. At that point, he heard Grommon say that she was going to die. Defendant handed Grommon a towel, then went into another room and got a cordless phone. He dialed 911 and handed the phone to Grommon. Defendant then left Grommon's apartment. Defendant stated that, as he traveled through the pool area of the building, he threw the knife into the snow near the pool. Police searched the area around the pool, but were unable to find a knife.

After disposing of the knife, defendant returned to his apartment and got into bed. Defendant told Officer Carter that, when the police arrived, he "played dumb."

Evidence technician Scott Carter testified that, at about 4:15 a.m. on March 5, 2002, he went to the hospital where Grommon had been admitted and photographed her injuries. Carter searched the pool area but did not find a knife. Carter also searched defendant's apartment. In the kitchen sink, Carter found a steak knife that appeared to have blood on it, along with hair or fibers. Carter field tested the knife, determining that it indeed had blood on it. Carter also collected some clothing from defendant's bedroom. Among the items he collected were two mismatched shoes, both of which had bloodstains and hair or fibers on them. Carter tested the stains on the shoes, determining that they too were bloodstains.

Michael Lafin, a deputy sheriff employed at the Du Page County jail, testified that, on March 6, 2003, he was making his final rounds before the nightly lock-down. Defendant, who had been fine all evening, gestured at Deputy Lafin with his middle finger (Lafin testified that defendant appeared to be fooling around and the gesture appeared to be reasonably playful and without rancor). Deputy Lafin proceeded to lock defendant into his cell first, upon which defendant was teased by some of the other inmates. Deputy Lafin described the teasing as ordinary and nothing unusual. Ten minutes later, Deputy Lafin observed defendant in his cell. Defendant was upset, sweating, and breathing heavily, and he appeared to be foaming at the mouth. Defendant also appeared to be shadow boxing. Deputy Lafin asked defendant what was going on, and defendant replied that "he was going to take care of business and kick everyone's ass." Deputy Lafin noted that during this encounter, defendant remained extremely agitated.

Mary Terrell, a social worker at Indian Plains Alternative High School, testified that defendant had been a student there for about two years. Terrell testified that, in November 2000, she heard defendant coming up a staircase, screaming and yelling loudly. Defendant's teacher, a woman in her early 50s, followed, trying to calm defendant. Defendant faced his teacher, pounded his fist in his hand, called her a liar, and said that he was going to beat her. Defendant then pushed past his teacher, for which he was charged with aggravated assault.

Terrell testified that, in January 2002, defendant and his mother were attending a family counseling session with her. Defendant turned volatile, screaming, swearing, and becoming increasingly angry. The school's police officer arrived and asked defendant to leave. Defendant refused, eventually telling the officer, "You do what you have to do." The

officer grabbed defendant's arm and said defendant was under arrest. Defendant resisted and a scuffle with the officer ensued. The officer's gun came out of its holster during the scuffle and Terrell picked up the gun. Terrell testified that at no time during the confrontation with the police officer did defendant attempt to gain possession of the officer's gun.

Terrell testified that defendant frequently made grandiose statements. In January 2001, during an argument with another student, defendant said if the student did not stop, there would be a "Columbine" at the school. Terrell testified that the consensus among the school staff was that defendant was not taking his medication at the times they saw him acting out and making threats. Terrell noted that defendant became more verbally aggressive and uncooperative when he was not taking his medication. Defendant could not be relied upon to tell the staff whether he took his medication; likewise, his mother could not positively say whether defendant had taken his medication on a given day.

Terrell also testified that, when she first met defendant, she found him to be well adjusted and polite. Defendant's mother struck Terrell as soft-spoken, immature, and not as involved in defendant's life as she could have been. Terrell believed that defendant was in charge of his mother's household. As defendant settled into life at the school, he became increasingly argumentative, uncooperative, and volatile, sometimes storming out of the classroom. Near the end of his time at the school, defendant engaged in a lot of fantasy talk and threatened the other students.

Terrell acknowledged that, in spring 2001, the staff became concerned that defendant was not taking his medication. Defendant's mother shared custody with the Department of Children and Family Services (DCFS) and did not cooperate with the school

in making sure defendant would take his medication. Defendant's mother told school staff that she did not approve of the medication and that, although she left it out for defendant, it was up to him to take it. Defendant informed Terrell that he did not want to take his medication.

The school then undertook a number of different efforts to ensure that defendant took his medication, but none proved entirely successful. At times, defendant's medication would not be timely refilled, resulting in defendant going days or weeks without his medication. In September 2001, Terrell made a hotline report about defendant's failure to take his medication. This report resulted in the school receiving permission to administer a dose of defendant's medication to defendant. Terrell testified that, during this time, defendant's behavior vastly improved. However, the same problems plagued the school and it was unable to secure timely refills of defendant's medication. When this happened, the school would have to start the medication regime over, which took time to become effective. In addition, as the school was administering only one dose, Terrell believed that defendant was not taking the full amount prescribed of his medication. Thus, while the amount administered was somewhat successful, Terrell believed that defendant could have benefitted further from taking all of the medication he was prescribed.

When defendant was agitated, he exhibited odd behaviors. As an example, Terrell testified about one incident in which defendant appeared to believe he was trapped. He became increasingly agitated and eventually, in order to escape, jumped out of a second-story window. Additionally, defendant would run from the building and would threaten to beat and kill everyone. Terrell testified that she observed many marks on defendant.

Defendant told Terrell that they were the result of fights with his mother, but would later change the story and say that he received them in a fall.

Terrell testified that, on the day before defendant's attack on Grommon, she observed defendant to be extremely volatile. Terrell was in her office, dealing with other students, when defendant entered. Terrell explained that this was not uncommon--she usually tried to accommodate defendant. Defendant was quiet and calm when he entered and said that he really needed to talk to Terrell. Terrell told defendant that she could not talk with him then, explaining that she was busy with the other students. Terrell testified that defendant had an odd smile on his face and that his face had an unusual, flaccid look to it. She described it as watery, too intense, and eerie. Defendant's appearance alarmed Terrell, and she called defendant's mother to tell her that defendant was not himself.

Dr. Rabin testified about his evaluation of defendant. Dr. Rabin recounted that he diagnosed defendant as suffering from bipolar disorder, mixed type, and post-traumatic stress disorder, by history. Defendant experienced mood swings from depressive to manic. When defendant was in a manic phase, he had grandiose delusions, pressured speech, and racing thoughts and was very restless and unable to relax. Defendant told Dr. Rabin that he would usually awaken at 2 a.m. every night, full of energy. Dr. Rabin testified that, when defendant felt trapped, he reacted aggressively and with panic. Dr. Rabin opined that defendant's behavior on the night of the attack on Grommon was consistent with a manic phase of his bipolar disorder and with his post-traumatic stress disorder. Defendant told Dr. Rabin that he had no idea why he went to Grommon's apartment. Defendant denied that he went there intending to attack, harm, sexually assault, or steal from Grommon. Defendant explained to Dr. Rabin that Grommon was a neighbor who had been friendly to

him.  Defendant said that he often did things that he did not understand.  Dr. Rabin noted that, after psychotic episodes, persons with bipolar disorder often are able to remember what they have done, but cannot recall why they did it.  Defendant's memory of what he had done but inability to recall why he went to Grommon's apartment comported with this bipolar disorder trait.

Dr. Rabin also testified that, when he first examined defendant, defendant was taking 1,200 milligrams of lithium a day.  Dr. Rabin testified that a person who suffers from bipolar disorder can live a normal life if medicated; however, he must take the medication consistently.  According to Dr. Rabin, the records he reviewed, as well as defendant's history, indicated that every time defendant became psychotic and was hospitalized, it was as a result of discontinuing his medication.  Dr. Rabin opined that defendant likely will have to take medication his entire life in order to control his bipolar disorder.

Rebecca Rosenmayer, defendant's social worker, testified that, in December 2000, she was assigned to provide therapy for defendant by Metropolitan Family Services.  In her opinion, defendant suffered from bipolar disorder and a conduct disorder.  In 2000, defendant was taking 300 milligrams of lithium daily.  Both defendant and his mother reported that defendant was taking the medication regularly.  Defendant did well for a while, but, in the fall of 2001, started to have more problems at school and with his mother.  In October 2001, defendant was placed in a youth home where a psychiatrist discontinued lithium.  Defendant was moved to the Linden Oaks partial hospitalization program, where his medication was again changed.  There, after experimenting with different drugs, defendant was returned to a 300-milligram daily dose of lithium.

On January 29, 2002, defendant was again hospitalized. His medication was increased, first to 900 milligrams of lithium daily, then to 1,200 milligrams of lithium a day. On February 14, 2002, defendant was released from the hospital and placed in a group home in Aurora, in an effort by DCFS to keep him out of his mother's home. On February 25, 2002, defendant's custody case was heard before the court, with the result that the DCFS case was closed and defendant's mother received sole custody of defendant.

With the closing of the DCFS involvement with defendant, Rosenmayer's involvement with defendant was also terminated. Rosenmayer set to work crafting a safety plan for defendant and his mother to help them to cope when they fought. They all planned to meet with a DCFS caseworker on March 4, 2002; however, the caseworker experienced car problems and canceled the appointment. Rosenmayer met defendant and his mother alone. Defendant was angry, but cooperative. He said that he looked forward to a new beginning so he could stop lying and doing bad things.

On March 14, 2002, after the attack, Rosenmayer again met with defendant. Defendant told her that he did not always have control of his mind. Defendant also told her that he did not want any more therapy, that he was not bipolar, and that he did not need medication. Rosenmayer testified that defendant often said that the medication did not help him and no one could make him take it. Rosenmayer testified that it was defendant's mother's preference to have defendant counseled at her church.

Sharon Rogers, defendant's aunt, testified that, since defendant was in kindergarten, he and his mother spent their time together mostly in "an uproar." She testified that signs of abuse appeared even before kindergarten and were too numerous to count. Rogers testified that defendant was hospitalized at least three times before 1996 for threatening to

harm himself. Sometimes, he was shifted from his mother's home to either his uncle's home, a foster home, or a group home. Rogers thought that defendant appeared to be more high strung when he was staying with his mother. Rogers recalled a family get together at which defendant and his mother fought physically. As a result, Rogers called DCFS, which refused to intervene. Rogers then called the police. Rogers also recalled, on that occasion, defendant's mother told defendant that she had never loved him, wished that he had not been born, and did not want him to live in her home. Rogers also testified that, although he was bigger than his mother, defendant's mother would hit him with her fist in the face, arm, and chest. Rogers testified that, in 1996, defendant's mother beat him so severely with a broom that he had to be admitted into a hospital. This incident triggered the DCFS involvement with defendant.

Officer Steve Baker, of the Naperville police department, testified that, on September 12, 1999, he stopped defendant for speeding and reckless driving. Defendant lied about his name and his age; nevertheless, Officer Baker eventually learned that defendant was 13 or 14 years old. Officer Baker testified that he overheard defendant tell his mother that he heard voices. Defendant's mother told Officer Baker that defendant had snuck out of her home and taken the car. Officer Baker later learned that defendant was visiting his mother's home on a weekend pass from a psychiatric facility and that he was taking several strong medications at the time.

Nancy Rodarte, a juvenile investigator for the Aurora police department, testified about an incident in which defendant stole a purse from a car. On June 16, 2001, the owner left her car in her apartment's parking lot while she went inside to use the bathroom.

Defendant and an accomplice entered the car and stole the purse. They pawned rings they found in the purse.

Rodarte also testified that, on October 19, 2001, defendant stole a car from a parking lot. The owner left the keys inside the car. The car was recovered the next day when its owner saw defendant driving it. Defendant admitted to a delinquency petition charging him with burglary to a motor vehicle in connection with this incident.

The trial court allowed Grommon to read her victim impact statement. Grommon described her injuries and the physical and emotional suffering caused by defendant's attack. Defendant presented a letter from the jail listing the various programs in which he had participated while incarcerated there. Defendant also presented the Kane County juvenile court file for the trial court's reference.

Following the evidentiary portion of the hearing, the trial court held that defendant caused great bodily harm to the victim, resulting in the application of the 85% truth-in-sentencing provision to defendant's ultimate sentence. The parties argued, the State requesting a 25-year sentence and defendant requesting a 12-year sentence. Defendant was allowed to speak in allocution and apologized for his conduct. Defendant promised that he would regularly take his medication and vowed that such a thing would never happen again. The hearing was continued for the court's pronouncement of sentence.

On June 2, 2003, the court passed sentence. The court found defendant's guilty plea, his youth, and the fact that, after completing the stabbing, defendant handed Grommon a towel and dialed 911, to be mitigating factors. The court noted that, because of defendant's mental illness, the ultimate motive or what moved defendant to attack Grommon was unknowable. Turning to factors in aggravation, the court stated that, when

defendant takes his medication, he has been law-abiding. The court noted that the lack of a cure and the questions about whether defendant would be diligent in taking his medication were factors in aggravation. The court discussed defendant's abusive upbringing and its relation to defendant's history of severe acting out and suicidal and homicidal threats, and concluded that defendant "has all the traits of being sociopathic." The court then considered the specifics of the attack on Grommon. The court appeared to be particularly disturbed by the senseless and brutal nature of the attack. In light of these considerations, the trial court sentenced defendant to 23-year terms of imprisonment for both the armed-violence and home-invasion convictions. The trial court also sentenced defendant to a five-year term of imprisonment for the aggravated-battery conviction. All of the sentences were ordered to run concurrently.

On June 25, 2003, defendant filed a motion for reconsideration of his sentences. The trial court denied the motion. Defendant timely appeals.

On appeal, defendant argues that the aggravated-battery conviction must be vacated because it violates the one-act, one-crime rule or, alternately, because it is a lesser-included offense of the armed-violence charge. Defendant also argues that the trial court abused its discretion in sentencing defendant to 23-year prison terms for the armed-violence and home-invasion convictions, contending that the minimum term of 10 years is a more appropriate sentence for each conviction.

In his first argument on appeal, defendant contends that his conviction of aggravated battery was based on precisely the same act as his armed-violence conviction. Defendant first acknowledges that he did not file a motion to withdraw his guilty plea and argues that we may nevertheless consider this issue because he challenged his sentence as excessive

or, alternately, because an objection to a surplus conviction may be considered as plain error. People v. Moshier, 312 Ill. App. 3d 879, 881 (2000). The State, for its part, attempts to avoid the substance of defendant's argument and contends that defendant has failed to preserve this issue for review, relying on the contract analysis of plea agreements established in People v. Evans, 174 Ill. 2d 320 (1996). The parties agree that our review of a one-act, one-crime issue or a lesser-included-offense issue presents a question of law that is reviewed de novo. People v. Landwer, 166 Ill. 2d 475, 486 (1995).

The first question we must answer, then, is whether defendant has forfeited our review of his issues on appeal by failing to file a motion to withdraw his guilty plea. Although neither party cites it, People v. Lumzy, 191 Ill. 2d 182, 186-87 (2000), dictates the answer to this question, at least regarding defendant's excessive-sentence issue. Lumzy noted that, generally, a defendant who challenges a sentence imposed pursuant to a plea agreement must both move to withdraw the guilty plea and vacate the judgment and move to reconsider his sentence. Lumzy, 191 Ill. 2d at 185, citing Evans, 174 Ill. 2d at 332. However, depending on the details of the plea agreement, this procedure is not always required. Lumzy noted that there are four different plea scenarios that can occur. At the extremes are blind pleas, where the plea is entered with no inducement from the State and both parties may argue for any legal sentence, and fully negotiated pleas, in which a defendant pleads guilty in exchange for a specific sentencing recommendation from the State. Lumzy, 191 Ill. 2d at 185. The fully negotiated plea was the type of plea agreement analyzed in Evans. Lumzy, 191 Ill. 2d at 185. A third category, analyzed in People v. Linder, 186 Ill. 2d 67 (1999), includes a plea agreement where the defendant pleads guilty in exchange for certain charges to be dropped and for a recommendation that the sentence

not exceed an agreed-upon sentencing cap. Lumzy, 191 Ill. 2d at 186. Lumzy identified the fourth category as an agreement to drop certain charges, but which is utterly silent as to the sentence the defendant is to receive. Lumzy, 191 Ill. 2d at 187. In this category of plea agreement, the defendant may file a motion to reconsider sentence, and this may be entertained with no need for the defendant to have filed a motion to withdraw guilty plea and vacate judgment. Lumzy, 191 Ill. 2d at 187. This is precisely the scenario presented here. Defendant agreed to plead guilty to three of the six counts with which he was charged; the State agreed to drop the remaining three counts and there was absolutely no mention or agreement made regarding the sentence to be imposed. Cf. People v. Diaz, 192 Ill. 2d 211, 222-25 (2000) (where any sentencing concession is made, such as an agreement not to impose an extended term, the defendant is required to move to withdraw guilty plea in order to challenge sentence). Thus, as to his excessive-sentence challenge, defendant was not required to file a motion to withdraw his guilty plea and vacate the judgment, and we may address this contention on appeal.

Lumzy does not provide guidance for the remaining contention, that, despite his voluntary guilty plea, defendant should be allowed to raise the surplus-conviction issue without first moving to withdraw his guilty plea. Defendant points to three cases that we will address in discussing his surplus-conviction issue. First, in Moshier, 312 Ill. App. 3d at 880, the defendant pleaded guilty to official misconduct and theft. Following sentencing, the defendant moved to reconsider the sentences imposed, contending that they were excessive. Moshier, 312 Ill. App. 3d at 881. The court held that the defendant's excessive-sentence challenge necessarily encompassed a surplus-conviction or one-act, one-crime issue. Moshier, 312 Ill. App. 3d at 881. Alternatively, the court held that the one-act, one-

crime issue could be addressed as plain error, and the court proceeded to address the merits of the defendant's contention even though the defendant did not file a motion to withdraw his guilty plea. Moshier, 312 Ill. App. 3d at 881.

Second, in People v. Johnson, 200 Ill. App. 3d 1018, 1020 (1990), the defendant ultimately pleaded guilty to charges of armed violence and aggravated battery and secured the dismissal of an attempted-murder charge. The defendant's motion to withdraw guilty plea, in which he claimed that his sentence was excessive but did not argue that his convictions violated the one-act, one-crime rule, was denied. Johnson, 200 Ill. App. 3d at 1020. For the first time on appeal, the defendant argued that the aggravated-battery conviction must be vacated because it was based on the same act as the armed-violence conviction. Johnson, 200 Ill. App. 3d at 1020. The State argued not that the two convictions were not a violation of the one-act, one-crime rule, but that the defendant had not preserved appellate review because he did not include the surplus-conviction issue in his motion to withdraw his guilty plea. Additionally, the State argued that the defendant's voluntary guilty plea waived appellate consideration of the surplus-conviction issue because the defendant consented to the convictions. Johnson, 200 Ill. App. 3d at 1021. The court held that the surplus-conviction issue presented a plain error that allowed it to consider the merits of the defendant's contention. Johnson, 200 Ill. App. 3d at 1021. The court also rejected the State's second argument, that the defendant consented to the imposition of the surplus conviction, because it determined that the "case [was] governed by the principle that multiple convictions of the same act are unlawful, and therefore, [the] defendant's consent [could not] cure the improper nature of multiple convictions [for the same act]." Johnson, 200 Ill. App. 3d at 1023.

Finally, in People v. Jackson, 64 Ill. App. 3d 159, 159 (1978), the defendant pleaded guilty to felony theft based on purchases of goods that had been stolen from two different owners, but that he purchased from one man for one sum of money.  The defendant filed a motion to withdraw his guilty plea, challenging his sentences as excessive, but not raising a surplus-conviction issue.  Jackson, 64 Ill. App. 3d at 159-60.  The court held it could reach the surplus-conviction issue because the excessive-sentence challenge necessarily included the surplus-conviction issue. The court reasoned that, if the defendant should have received only one conviction and sentence, then "the other conviction and the sentence imposed was certainly excessive."  Jackson, 64 Ill. App. 3d at 160.  The court alternatively based its holding on the conclusion that a surplus conviction was cognizable as plain error.  Jackson, 64 Ill. App. 3d at 160.

The State counters, contending that the dismissal of three of the charges goes hand-in-hand with the guilty plea.  As a result, it would be unfair to allow defendant to accept the benefit of having three charges dropped and repudiate his part of the agreement to accept convictions of the remaining three charges.  In support, the State cites to Evans, 174 Ill. 2d at 327, which noted that it was inimical to the criminal justice system and the vitally necessary and desirable plea bargaining process to allow a defendant to hold the State to its part of the bargain while unilaterally attempting to change his obligation under the plea agreement.  Evans further endorsed the analysis of plea bargains according to contractual principles.  Evans, 174 Ill. 2d at 326.  The court concluded that, in order to keep the process fair to both sides, any time the defendant wished to change his obligations under a plea agreement, the parties would have to be returned to the status quo preceding the plea agreement; thus for a negotiated plea, the defendant was required to move to withdraw his

guilty plea. <u>Evans</u>, 174 Ill. 2d at 332. The court also noted that, where a defendant enters an open guilty plea, a return to the status quo before the plea agreement does not require the defendant to relinquish his guilty plea, and the defendant in this circumstance may challenge his sentence without being required to withdraw his guilty plea. <u>Evans</u>, 174 Ill. 2d at 332.

Additionally, the State notes that, by agreeing to plead guilty, the defendant relinquishes any rights to challenge nonjurisdictional errors or irregularities. <u>People v. Townsell</u>, 209 Ill. 2d 543, 545 (2004). <u>Townsell</u> also distinguished the waiver that is cognizable under the plain-error rule, embodied in Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)), from the guilty plea waiver of errors: plain error concerns the failure to bring an error to the trial court's attention, while a guilty plea results in the voluntary relinquishment of a known right. <u>Townsell</u>, 209 Ill. 2d at 547. Thus, according to <u>Townsell</u>, plain-error (Rule 615(a)) analysis does not speak to waivers of rights upon pleading guilty, <u>i.e.</u>, the voluntary relinquishment of known rights. <u>Townsell</u>, 209 Ill. 2d at 547-48.[2]

---

[2] While the dissent pays lip service to <u>Townsell</u>, it fails to analyze why defendant's failure to raise the surplus-conviction issue is cognizable under plain error. In the context of a guilty plea, <u>Townsell</u> teaches that plain error is not applicable to issues not specifically preserved.

Having explored each party's position, we note that each position is largely nonresponsive to the other. This observation is borne out by the fact that the State does not deal with any of the authority cited by defendant and, likewise, defendant scarcely considers the State's authority in replying to the State's argument. That said, we find the State's position to be the better reasoned in this case.

The State's position implicitly recognizes that this is a charging issue, and not a sentencing issue. Here, defendant's plea agreement was to accept convictions of three charges, with the State agreeing to dismiss the three remaining charges. By contrast, in Moshier, 312 Ill. App. 3d at 880, the defendant pleaded guilty to all of the charges against him; thus, there was no agreement to dismiss any charges between the State and the defendant in the plea agreement there. The defendant in Moshier, therefore, cannot be seen to have been trying to hold the State to its bargain while avoiding his obligation; the State had to give up nothing in the plea agreement. Likewise, Lumzy deals with sentencing issues, not charging issues. Lumzy, 191 Ill. 2d at 187. Thus, neither Lumzy nor Moshier offers guidance to this issue.

Neither the parties' nor our own research has uncovered a surplus-conviction case involving a guilty plea where the object of the plea agreement was solely the dismissal of charges filed against the defendant and not the sentence to be imposed against the defendant. Despite its surface similarity to Moshier and Lumzy's fourth category (open plea, dismiss charges), this case is more susceptible to the Evans analysis. Evans emphasizes that contractual analysis is only an approximate fit in analyzing an appeal arising from a guilty plea (Evans, 174 Ill. 2d at 327), and that the object of the analysis is to place the parties back into the status quo before they entered the plea agreement (Evans,

174 Ill. 2d at 332).  Here, defendant agreed to plead guilty to three of the six charges against him, and the State agreed to dismiss three of the six charges against defendant, without subjecting defendant to the uncertainty of a trial.  No sentencing concessions or considerations were a part of the plea agreement.  Thus, the object of the plea agreement was the dismissal of certain charges against defendant.  In order to return the parties to the status quo before the plea agreement, defendant would have to withdraw his guilty plea. (Note that, in a negotiated plea situation where the parties agree to both sentencing concessions and the dismissal of charges, the defendant's benefit is avoiding convictions (and sentences) on the dismissed charges, which are what the State is giving up.  In order to bring the parties to the status quo before the plea agreement, the dismissed charges have to be put back on the table, otherwise the State will still be operating under the detriment of not being able to obtain convictions of the dismissed charges.)  Because defendant did not withdraw (or even move to withdraw) his guilty plea here, the parties have not been returned to the status quo before the plea agreement.  Therefore, pursuant to Evans, 174 Ill. 2d at 332, defendant is not entitled to have his surplus conviction reviewed, as that was the product of a voluntary plea agreement.

We note that the dissent disputes our determination that this was truly an agreement between defendant and the State, and weighs the relative value of what it perceives to be the benefit and detriment to each party.  This is a mistake in the dissent's analysis.  It is well settled in contract law that any act that provides a benefit to one party or a detriment to the other party is sufficient consideration to support the formation of a contract.  Kalis v. Colgate-Palmolive Co., 337 Ill. App. 3d 898, 900 (2003).  This includes the promise to forgo a legal claim even if the claim is later found to be invalid and "even if, at the time of the

promise, a court has already found the claim to be without merit." Kalis, 337 Ill. App. 3d at 901. The import of this rule is that the promise to dismiss the charges is sufficient consideration to support the plea agreement even if, as the dissent contends, the charges dismissed were alternative or duplicative of the three charges to which defendant pleaded guilty. The dissent's analysis fails to note that defendant is not required to defend against any of the charges as a result of the plea agreement. Further, the dissent does not explain how allowing defendant to challenge the surplus conviction without moving to withdraw his guilty plea places the parties in the status quo before the plea agreement. Instead of six charges pending against defendant, the dissent's analysis would halve the charges against defendant and would preclude the State from charging defendant alternatively, thereby changing the positions of the parties from the original starting point. This violates the command of Evans that the parties be returned to the status quo before the plea agreement.

The dissent worries that our holding here will always require a defendant to file a motion to withdraw guilty plea in order to preserve a surplus-conviction issue. The dissent's concern is unfounded because, here, there was an agreement between the parties dismissing certain charges. To raise a surplus-conviction issue, such an agreement requires a motion to withdraw guilty plea in order to return the parties to the status quo before the agreement. Had defendant entered a blind plea, then, pursuant to Evans, he would not have been required to file a motion to withdraw guilty plea.

In determining that an Evans analysis is more appropriate to the facts of this case, we note that, in addition to Lumzy and Moshier, Jackson is distinguishable, and Johnson is poorly reasoned and we decline to follow it. Johnson based its result on a determination

that the surplus conviction was void. This was achieved by creating a questionable syllogism. The court noted the fact that surplus convictions had been vacated by other courts and that the definition of "vacate" is to render an act void. From these propositions, it concluded that the surplus conviction was void. Johnson, 200 Ill. App. 3d at 1022. However, "void" is often used interchangeably with "voidable" (People v. Davis, 156 Ill. 2d 149, 155 (1993)), and this is precisely the Johnson court's error.

Whether a judgment is void or voidable turns on the court's jurisdiction, and where jurisdiction is lacking, the judgment is void. Davis, 156 Ill. 2d at 155. A voidable judgment, by contrast, is one entered erroneously by a court having jurisdiction. Davis, 156 Ill. 2d at 155. Where a court exceeds its power, the judgment is void; however, a court with jurisdiction that enters an erroneous judgment has entered a voidable judgment. Davis, 156 Ill. 2d at 155-56. Further, where a court has jurisdiction over the defendant and the subject matter, then any authorized judgment, even if in error, will be voidable, and not void. Davis, 156 Ill. 2d at 157. In Johnson, the court had jurisdiction over the defendant and the subject matter, and had the authority to enter a conviction of and a sentence for either of the charged offenses; entering judgment on both was merely error and did not divest the court of jurisdiction. In short, the judgment was merely voidable, and procedural defaults could block a defendant's challenge to the judgment.

Jackson is distinguishable in light of Townsell, 209 Ill. 2d 543. Jackson invoked plain error, because the defendant failed to raise the surplus-conviction issue before the trial court, even though the defendant moved to withdraw his guilty plea. Thus, in Jackson, the court could notice the surplus conviction as plain error because the defendant had moved to withdraw his guilty plea and failed to bring the surplus-conviction issue to the trial court's

attention.  Townsell, 209 Ill. 2d at 547.  Here, the guilty plea remained uncontested, and with it, defendant's voluntary relinquishment of rights, such as the surplus-conviction issue.  See Townsell, 209 Ill. 2d at 547.  Based on the foregoing, we hold that defendant has forfeited our consideration of his contention regarding his surplus conviction.

We next consider defendant's excessive-sentence contention.  We may review this contention as defendant entered an open plea with regard to sentencing, which, under Lumzy, 191 Ill. 2d at 187, is cognizable even where the defendant does not file a motion to withdraw his guilty plea.  The trial court is vested with broad discretion in sentencing a defendant, and its sentencing decision is entitled to great deference.  People v. Stacey, 193 Ill. 2d 203, 209 (2000).  Deference is accorded the trial court because it is in a better position than a reviewing court to determine the appropriate sentence by weighing the various factors, like the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age.  Stacey, 193 Ill. 2d at 209.  As a result, the reviewing court must not substitute its judgment for that of the trial court because it would have weighed the factors differently.  Stacey, 193 Ill. 2d at 209.  Accordingly, we will not disturb the trial court's sentencing decision absent an abuse of discretion.  Stacey, 193 Ill. 2d at 209-10.  However, even if the sentence is within statutory limits, where it is grossly at variance with the spirit and purpose of the law, or where it is manifestly disproportionate to the nature of the offense, it will be deemed excessive and an abuse of discretion.  Stacey, 193 Ill. 2d at 210.

With these principles in mind, we turn to defendant's contention.  Defendant argues that 23 years, which is just seven years shy of the maximum penalty here, is excessive because it fails adequately to consider his personal culpability and rehabilitative potential.

Defendant argues that the trial court gave short shrift to his mental illness even though it was the only explanatory factor for the senseless and unfathomable attack on Grommon. In addition, defendant argues his youth and lack of violent history also were not appropriately considered. Defendant concludes that, in light of these factors, defendant's 23-year sentence "does not accurately reflect his culpability such that it shocks the moral sense of our community." Defendant derives the quoted phrase, as well as support for his contention, from People v. Miller, 202 Ill. 2d 328 (2002).

There, the defendant, a 15-year-old boy, faced a mandatory sentence of natural life imprisonment when he acted as a lookout in a double murder. Miller, 202 Ill. 2d at 330. The trial court declined to impose the mandated sentence, holding that it was unconstitutional as applied to the defendant. Miller, 202 Ill. 2d at 331-32. The supreme court agreed, noting that the defendant had been asked to serve as a lookout about a minute before the two murders occurred. The supreme court found that, "where a 15-year-old with one minute to contemplate his decision in the incident and stood as a lookout during the shooting, but never handled a gun, is subject to life imprisonment with no possibility of parole," which was the same sentence applicable to the shooter, "grossly distorts the factual realities of the case and does not accurately represent defendant's personal culpability such that it shocks the moral sense of the community." Miller, 202 Ill. 2d at 341.

After careful consideration of defendant's argument and authority, we conclude that the trial court did not abuse its discretion in sentencing defendant to a 23-year term of imprisonment. The record establishes that defendant was violent at the times he was not taking his medication, which was all too frequently. Defendant verbally threatened the

people who were around him--classmates, teachers, bus drivers, inmates.  He shoved teachers, leaped from windows, and physically menaced people.  Additionally, defendant, acting under the compulsion of the manic phase of his mental illness, nevertheless paused to grab a knife to bring with him to Grommon's apartment.  These facts belie defendant's contention that the record does not show that defendant would choose to attack someone for criminal reasons.

We note that defendant's mental illness is not necessarily a mitigating factor.  The evidence showed that it was incurable.  Further, the evidence showed that persons suffering from bipolar disorder typically deny their illness and fail to take the medication necessary to control their illness.  Defendant himself exhibited these behaviors.  Thus, the trial court could have considered this to weigh more in aggravation than mitigation when considering the danger defendant presents to society.

While Miller provides a small measure of guidance, it is too factually remote to control.  There, a youth whose involvement in a double murder was as slight as it could be was to be punished with the same extreme sentence (life with no possibility of parole) as the shooter.  Here, by contrast, defendant was the only actor.  While his culpability may be lessened because, due to his mental illness, he cannot explain why he committed the crime, it is not extinguished.  Quite clearly, it is significantly greater than that of the defendant in Miller.  Moreover, unlike the mandatory sentence found to be unconstitutional in Miller, defendant's sentence here allows the prospect of his rehabilitation and return to society.

Our review of the record shows that the trial court carefully considered the appropriate factors in mitigation and in aggravation.  The trial court was most concerned

with the senseless, horrifying nature of the crime and the danger defendant presents to others. While a different court may have determined a different balance among the various factors presented here, we cannot say that the trial court's determination was an abuse of discretion. Although we are mindful of the harshness of the penalty defendant rightly must face for his actions, we note that even defendant concedes that his conduct was particularly brutal and horrifying. In addition, it is important to our review that the sentence was well within the statutory range, as well as less than the State recommended. Based on our review of the record, we hold that the trial court did not abuse its discretion; rather, it diligently and carefully exercised it in fashioning a sentence that appropriately balanced all of the various sentencing factors.

For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County.

Affirmed.

BYRNE, J., concurs.

JUSTICE HUTCHINSON, concurring in part and dissenting in part:

I concur with the majority's holding that the trial court did not abuse its discretion in imposing concurrent 23-year sentences for defendant's armed-violence and home-invasion convictions. However, I dissent from the majority's conclusion that defendant has forfeited consideration of his contention that his aggravated-battery conviction violated the one-act, one-crime doctrine. I would reach the merits of this contention under the plain-error rule of Rule 615(a) despite defendant's failure to file a motion to withdraw his guilty plea. A close examination of the plea agreement accepted by the trial court reveals that the State did not make any concessions in return for defendant's guilty plea. Although the State dismissed three charges, the State could not

have gained convictions on these charges, as they were alleged in the alternative to the three charges to which defendant pleaded guilty. Defendant also did not receive any sentencing concessions as a result of the State's agreement to allow him to plead guilty but mentally ill. Therefore, I believe that defendant's guilty plea was essentially an open plea and that he was not required pursuant to Evans to file a motion to withdraw his guilty plea to avoid forfeiture of the issue on appeal.

An examination of the charging instrument is necessary to properly understand the nature of the plea agreement accepted by the trial court. A review of the six-count indictment filed in this case reveals that the State alleged three different theories of criminal culpability: armed violence (counts I and II), home invasion (counts III and IV), and aggravated battery (counts V and VI). As the State acknowledged during oral argument, the State pleaded two alternative counts as to each theory, alleging slightly different facts. In the counts alleging armed violence, count I alleged that defendant stabbed the victim repeatedly while armed with "a knife with a blade at least 3 inches long"; count II alleged that defendant stabbed the victim repeatedly while armed with "a switchblade knife." In the counts alleging home invasion, count III alleged that defendant entered the victim's dwelling and remained there until he "knew" the victim was present and stabbed her repeatedly with a knife; count IV alleged that defendant entered the victim's dwelling and remained there until he "had reason to know" the victim was present and stabbed her repeatedly with a knife. In the counts alleging aggravated battery, count V alleged that defendant caused the victim "great bodily harm" by stabbing her repeatedly with a knife; count VI alleged that defendant stabbed the victim repeatedly using "a deadly weapon."

Although the State alleged two alternative counts as to each theory of criminal culpability, each of the alternative counts was predicated upon the same physical act and could support only one criminal conviction as to each theory. See People v. King, 66 Ill. 2d 551, 566 (1977) (noting that a

criminal defendant may not be convicted of more than one offense carved from the same physical act). Both counts I and II were predicated upon defendant's physical act of stabbing the victim while armed with a dangerous weapon; counts III and IV were predicated upon defendant's physical act of entering the victim's dwelling when he knew or had reason to know that the victim was present and intentionally causing injury to her; counts V and VI were predicated upon defendant's physical act of stabbing the victim. Putting aside for the moment defendant's contention that the armed-violence and the aggravated-battery counts were carved from the same physical act, it is evident from the charging instrument that the State could maintain only one conviction each with respect to the offenses of armed violence, home invasion, and aggravated battery. Indeed, at oral argument, the State acknowledged that three of the counts had been pleaded in the alternative. Thus, in the event that the State secured convictions on all six counts contained in the indictment, the trial court would have been required to merge the three convictions of the alternative counts to avoid a violation of <u>King</u>. The State was never in a position to secure six convictions in this case; the best case scenario for the State was that it would secure three convictions, one each for armed violence, home invasion, and aggravated battery. This was precisely what the State achieved when defendant pleaded guilty to one count of armed violence (count I), one count of home invasion (count III), and one count of aggravated battery (count VI).

I do not take issue with the majority's summary of <u>Evans</u> or its general statement that a defendant who has received charging concessions from the State must move to withdraw his or her plea in order to avoid relinquishment of the right to challenge nonjurisdictional errors or irregularities. See <u>Townsell</u>, 209 Ill. 2d at 547-48. However, applying these principles to this case, I reject the majority's conclusion that defendant received a benefit or a concession as a result of the State's dismissal of counts II, IV, and V. As the State could not have secured convictions upon these

three alternative charges, it did not give up anything in dismissing them in exchange for defendant's guilty plea. Thus, what appeared on the surface to be a plea agreement consisting of a bargained-for exchange between the State and defendant, in essence amounted to an open plea by defendant in which he pleaded guilty to each of the three criminal theories charged by the State. Although defendant may have believed that he was receiving a benefit as a result of State's dismissal of counts II, IV, and V, such a benefit was illusory because the State would have been unable to maintain convictions upon these alternative charges. See King, 66 Ill. 2d at 566.

Defendant also did not gain a benefit as a result of the State's agreement to allow him to plead guilty but mentally ill. Such an agreement did not guarantee that defendant would receive a shorter sentence. See 730 ILCS 5/5--2--6(a) (West 2002). The trial court certainly could have considered defendant's mental illness as a sentencing factor even if defendant had entered a straight guilty plea. See People v. Robinson, 221 Ill. App. 3d 1045, 1052 (1991). Pleading guilty but mentally ill also did not necessarily guarantee that defendant would receive specific treatment for his mental illness while incarcerated. See 730 ILCS 5/5--2--6(b) (West 2002) (requiring the Illinois Department of Corrections to provide such treatment for a defendant found guilty but mentally ill "as it determines necessary").

As defendant did not receive any benefit in return for his guilty plea, I believe that the circumstances in this case are comparable to those in Moshier. Here, as in Moshier, the defendant pleaded guilty to all of the possible charges upon which the State could maintain criminal convictions. See Moshier, 312 Ill. App. 3d at 880. As was the case in Moshier, there was no exchange of benefits between defendant and the State in the plea agreement entered in this case. Moshier, 312 Ill. App. 3d at 880. Accordingly, because the State relinquished nothing in the plea

agreement, I do not believe that the instant appeal can be seen as an attempt by defendant to hold the State to its bargain while avoiding his own obligation.

Under the reasoning applied by the majority in this case, a defendant will always receive a legally recognizable benefit in pleading guilty that will necessitate the filing of a motion to withdraw guilty plea to preserve errors on appeal. Such a result is at odds with the jurisprudence of our supreme court and I decline to join such a holding. See Lumzy, 191 Ill. 2d at 185-87 (identifying various types of guilty pleas). The record in this case plainly indicates that defendant did not receive any benefit, real or intangible, in return for his guilty plea. Lacking any indication in the record that defendant received a legally recognizable benefit in return for his guilty plea, I believe that the appropriate conclusion in this case was that reached by the reviewing court in Moshier: that consideration of the surplus-conviction issue is appropriate under the plain-error doctrine despite defendant's failure to file a motion to withdraw his guilty plea. See Moshier, 312 Ill. App. 3d at 881.

I would address the merits of defendant's surplus-conviction contention as follows. It is well established in Illinois that aggravated battery is a lesser-included offense of armed violence. See People v. Donaldson, 91 Ill. 2d 164, 170 (1982) (holding that multiple convictions of both armed violence and the underlying felony cannot stand where a single physical act is the basis for both charges). As detailed above, all of the armed-violence and the aggravated-battery counts filed in this case were predicated upon defendant's physical act of stabbing the victim. Because the State did not attempt to differentiate between the separate stab wounds in the indictment, it is evident that the State was charging defendant with a single physical act. See People v. Crespo, 203 Ill. 2d 335, 342-43 (2001). Under these circumstances, multiple convictions of armed violence and aggravated battery cannot stand. See Crespo, 203 Ill. 2d at 342-46. Accordingly, I believe the appropriate

disposition in this case would be to vacate defendant's conviction of the lesser-included offense of aggravated battery (count VI).

For these reasons, I concur in part and dissent in part.